[No. 1089.]

## E. H. ROSE et al., Respondents, *v.* RICHMOND MINING COMPANY OF NEVADA, Appellant.

Writ of Error to Supreme Court of U. S.—Supersedeas Bond—Rights of Parties.—Respondents having obtained judgment in the supreme court of this state are entitled to such process as will enable them to enjoy the fruits of the judgment. In order to make the writ of error to the supreme court of the U. S. operate as a supersedeas, the bond should be ample in amount to protect the respondents against all damages which it is reasonable to believe will result from the issuance of the writ.

Idem—Value of Ore to be Considered in Fixing Amount of Bond.—The value of the ores contained in the mining ground in controversy which, but for the supersedeas, could and naturally would be worked during the pending of the writ of error, must be taken into consideration in providing good and sufficient security for just damages on account of delay.

Idem—Estimates Upon Amount of Bond Required.—In fixing the amount of bond the following estimates are made: 1—As to the ore in sight, $55,-000. 2—For deterioration of property, necessary expenses in preserving it, etc., $127,260. 3—Damages for delay in working the ground in dispute, outside of ores in sight, and realizing the probable profits therefrom, with interest, $242,690. 4—For costs, $600. Total, $425,550.

Application to the chief justice to fix the amount of bond required to make the writ of error to the supreme court of the United States, from the judgment of the supreme court of the state, operate as a supersedeas. The bond required by the chief justice was not given.

*Wren & Cheney, R. M. Clarke* and *Crittenden Thornton* for Appellant in Error.

*Stewart & Herrin, W. S. Wood* and *Baker & Wines* for Respondents in Error.

Opinion by Leonard, C. J.:

On the sixteenth day of March, 1882, the judgment of the

district court herein, in favor of the defendant, was reversed by the supreme court and the cause remanded, with instructions to the district court to render a proper judgment in favor of the plaintiffs and against the defendant, in compliance with the views expressed by the court in its opinion, for all that portion of the mineral lode in controversy, westerly of the westerly line of the Tip Top claim, designated upon the diagram inserted in the opinion by the line A C; and with further instructions to order the injunction against defendant as to this portion of the lode to be made perpetual, and a judgment in favor of plaintiffs for their costs.

Subsequently the mandate of the supreme court was obeyed by the district court, and the judgment thereupon became final.

The defendant, the Richmond Mining Company of Nevada, being desirous of taking the cause to the supreme court of the United States, by writ of error which shall operate as a supersedeas and stay execution, makes application to me as chief justice for a citation and for the approval of such security as is required by law, upon the issuance of the same.

By reason of the extreme views entertained by counsel for the respective parties, in relation to the amount of security that ought to be required, in order to render it "good and sufficient," five witnesses were examined upon each side, and from the testimony it becomes my duty to fix the amount of security that must be given.

The statute (1 U. S. Stat. at Large, 85; Desty's Fed. Procedure, sec. 1000) provides that "every justice or judge signing a citation on any writ of error shall, except in cases brought up by the United States, or by direction of any department of the government, take good and sufficient security that the plaintiff in error, or the appellant, shall prosecute his writ or appeal to effect, and, if he fail to make his plea good, shall answer all damages and costs, where the writ is a supersedeas and stays execution, or all costs only where it is not a supersedeas as aforesaid." The statute also provides that writs of error from the supreme court to a state court, in cases authorized by law, shall be issued in the same manner and under the same regulations, and shall have the same

effect, as if the judgment or decree complained of had been rendered or passed in a court of the United States. The twenty-ninth rule of the supreme court of the United States is as follows : "Supersedeas bonds in the circuit courts must be taken with good and sufficient security, that the plaintiff in error or appellant shall prosecute his writ or appeal to effect and answer all damages and costs, if he fail to make good his plea. Such indemnity, where the judgment or decree is for the recovery of money not otherwise secured, must be for the whole amount of the judgment or decree, including just damages for delay, and costs and interest on the appeal; but in all suits where the property in controversy necessarily follows the event of the suit, as in real actions, replevin and in suits on mortgages, * * * indemnity in all such cases is only required in an amount sufficient to secure the sum recovered for the use and detention of the property, and the costs of the suit, and just damages for delay, and costs and interest on the appeal."

I must be controlled by the foregoing statutes and rule, and further on shall have occasion to ascertain their meaning when applied to a case like the one in hand.

The court below found, and such were the facts, that each party was in actual possession of portions of the lode in dispute; that is to say, to the extent of the underground workings of each, and that, in addition, plaintiffs had such possession of the entire ground as is given by the doing of all work required by law to hold mining claims. The court also found that, at the time of the trial, the Albion Consolidated Mining Company was the owner of the Uncle Sam claim, the ground in dispute, and that this action was prosecuted for its benefit by consent of the plaintiffs.

Under the judgment entered, the Albion company is entitled to the possession, in law and fact, to all the ground in dispute. It is entitled to all the benefits and privileges which an absolute ownership and right of possession give. Its rights are to work the ground unmolested as it may wish, and to appropriate the proceeds of its labor and expenditure. If the entire possession is refused by the defendant, it is entitled to such process as will enable it to enjoy the fruits of its judg-

ment. (*Kershaw* v. *Thompson*, 4 Johns., Ch. 608; 2 Daniels Ch. Pr., and Proc. 1062; Herman on Ex. 529, *et seq*; Freeman on Ex., secs. 469, 470; *Montgomery* v. *Tutt*, 11 Cal. 190.)

Until such rights are enjoyed, the judgment is not executed, and if a supersedeas is obtained, their enjoyment will be postponed until there shall be a final decision of the supreme court of the United States. Conceding that the Albion company has the actual possession of a part of the ground in dispute, still the right of possession as to any part is denied by a prosecution of the writ of error, and if defendant's claim of error is correct, the Albion company, in law, is a trespasser to the extent of its possession. Whether, under such circumstances, that company could legally work upon any part of the ground in dispute, after supersedeas, if no injury should be done thereto, I shall not stop to inquire; but that it would not be permitted to do permanent injury to the property, I have no doubt. Should it develop new ground and open new ore bodies, it could not appropriate the ores. The object of the supersedeas is to keep the property substantially as it is, until judgment of the supreme court. For all practical purposes then the effect of the supersedeas will be the same as to all parts of the disputed ground. If the Richmond company had actual possession of the whole claim, a supersedeas would undoubtedly enable it to retain the same. It will enable that company to retain all possession it now has, and, as before stated, the Albion company will not be permitted to do permanent injury to the estate.

Under such circumstances, the Richmond company cannot complain if the Albion company ceases work, even though it *may* continue, where no injury can result in case the present judgment should be reversed or modified. Surely, I cannot presume the Albion company will make any developments during the pendency of the writ of error, since it is not in law bound to do so; and if any should be made, the work would be done at the risk of a total loss if there are good grounds for the writ. At any rate, should the Albion company expend money upon the disputed ground in case of

supersedeas, it would take all the risk of its total loss upon itself. Such being the case, the Richmond company cannot complain if I act upon the presumption that the Albion company will not, at its own risk, make further developments, while the supersedeas remains operative. If I am right so far, then I must proceed upon the hypothesis that when security is given which shall have the effect of a supersedeas, no other ores will be disclosed until after final decision, even though they exist and might be exposed before a final disposition of the case. My action, then, cannot be influenced by the fact that, in a proper case, the supreme court of the United States, after appeal or writ of error taken, may and will interfere and require additional security upon a supersedeas; that is to say, when, "after security has been accepted, the circumstances of the case, or of the parties, or of the sureties upon the bond, have changed, so that security which, at the time it was taken, was 'good and sufficient,' does not continue to be so."

There is nothing shown to me whereby I can conclude that the circumstances of the case will change, pending the writ of error. That is to say, that developments will be made and other ore bodies disclosed, if they exist. But, on the contrary, there is much to convince me that work will be discontinued in the disputed ground in case of supersedeas. I must assume, then, that as the security is now fixed, so it will remain.

The next question that requires consideration is, whether I can and should take into account merely the ores actually in sight, or, in addition, may and should include, as a part of the basis of my calculations, reasonable and fair probabilities of the existence of ore deposits, other than those now known in fixing the amount of "good and sufficient security" for damages and costs. In my opinion, to do justice, I must include the element of reasonable probability, and that, in law, such is my duty. I recognize the fact, in the outset, that this conclusion brings difficulties with it, and that the proper sum to be set down as "good and sufficient security," in this regard, will at last be somewhat uncertain. But these circumstances do not alter the case.

As to the ore in sight, a reasonable discretion must be exer-

cised in determining the amount and value, because the evidence upon both points is painfully conflicting, and the estimates of the respective parties are widely different. It is conceded that some ore bodies contain a great amount of waste, while in others, but little is found. Ore body "B" may contain much or little waste, still it is admitted to be my duty to balance the testimony on these questions as best I can. Why is it not incumbent upon me, then, to conclude from the great mass of testimony upon the point whether or not it reasonably appears that there are other ore bodies in the ground in dispute, which, during the pendency of the writ of error, would be exposed and worked if there should not be a supersedeas? The statute declares that the security must be sufficient to cover all damages and costs which the Albion company will suffer and may recover by reason of the writ, if the judgment of this court is affirmed.

If other ore bodies exist, although their present whereabouts are now unknown, which, but for the supersedeas, the Albion company might and would develop and utilize, the damage will be just as great as it would be if they were in sight. The bare *possibility* of finding ore in undeveloped ground, without evidence of a reasonable probability of its existence, would not justify me in requiring security to cover such *possibility.* But, on the other hand, I can find no justification in refusing to require security sufficient to cover reasonable *probabilities.*

If by some test now unknown, it were possible to ascertain with reasonable, but not infallible certainty, as to the existence or non-existence of ore bodies in the ground in dispute, would it be denied that, in this proceeding, evidence showing the result of such test should be received and considered? If science or experience shows, as a general rule, that in a certain locality one result follows certain conditions, why should not evidence of the existence or non-existence of such conditions be admitted and acted upon with other facts in ascertaining whether or not, in the case in hand, it is reasonably certain that the result will accord with the general rule?

Suppose the property in dispute in this case was timber land; that it would be very valuable if a certain railroad should be built, but otherwise of little value; can it be

doubted that evidence establishing with reasonable certainty that the road would be completed long before a decision could be had in the supreme court, ought to be received and considered important in estimating the damages that plaintiff would sustain? True, in such case, it might be argued that the completion of the road would be a change of circumstances which, under the rule laid down in *Jerome* v. *McCarter*, 21 Wall. 31, would justify the supreme court in requiring additional security if the amount first fixed was insufficient. But that fact does not militate against my conclusion in this case, because here, in all reason, there will be no change of circumstances if there is a supersedeas. Besides, if I interpret *Jerome* v. *McCarter* correctly, it is the duty of the chief justice to act upon existing facts, although they do not amount to absolute demonstration beyond the possibility of doubt. It is my duty to require security according to those facts as they are presented, and the supreme court of the United States will presume that I so acted.

If the object of this proceeding was to establish a definite amount which the Richmond company should actually pay the Albion company as damages for delay, in case of affirmance, it might and should be urged that evidence of the probable existence of other ore bodies in the ground in question, ought to be considered with great caution; but even in that case it would, in my opinion, be admissible, and in arriving at a proper result it should be given weight according to the facts and circumstances proven.

But in fixing the amount of security on appeal or in error it was not expected or intended that it should be established with the accuracy of a verdict or judgment. It should be ample to protect the respondent in error against all damages which it is reasonable to believe will result from the writ.

In *Catlett* v. *Brodie*, 9 Wheat., the court said: "The word 'damages' is here used not as descriptive of the nature of the claim upon which the original judgment is founded, but as descriptive of the indemnity which the defendant is entitled to, if judgment is affirmed. Whatever losses he may sustain by the judgments not being satisfied and paid, after the affirmance, these are the damages which he has sustained, and

for which the bond ought to give good and sufficient security. Upon any suit brought on such bond it follows, of course, that the obligors are at liberty to show that no damages have been sustained, or partial damages only, and for such amount only is the obligee entitled to judgment.

Under the statute and the rule of the supreme court above quoted, as well as the decided cases, I have no doubt that the amount of security in this case, if the writ is to operate as a supersedeas, is left to my legal discretion.

In *Jerome* v. *McCarter, supra.*, it is said : "This is a suit on a mortgage, and therefore, under this rule (29), a case in which the judge who signs the citation is called upon to determine what amount of security will be sufficient to secure the amount to be recovered for the use and detention of the property, and the costs of the suit, and just damages for the delay and costs, and interest on the appeal. All this, by the rule, is left to his discretion. In *Black* v. *Zacharie*, 3 How. 495, it was held that in such a case the justice taking the security was the sole and exclusive judge of what it should be. Since then, in *Rubber Company* v. *Goodyear*, 6 Wall. 156, and *French* v. *Shoemaker*, 12 Wall. 94, remarks have been made by judges announcing the opinion of the court which, if considered by themselves, would seem to indicate that this discretion could be controlled here upon an appropriate motion. The precise point involved in this case was not, however, before the court for consideration in either of those, and we think was not decided. We all agree that if, after the security has been accepted, the circumstances of the case, or of the parties, or of the sureties upon the bond, have changed, so that security which, at the time it was taken, was ' good and sufficient,' does not continue so, this court may, upon a proper application, so adjudge and order as justice may require. But upon facts existing at the time the security was accepted, the action of the justice, within the statute, and within the rules of practice adopted for his guidance, is final. And we will presume that when he acted every fact was presented that could have been. So, while we agree that, in a proper case, after an appeal or writ of error taken here, this court may interfere and require additional security upon a supersedeas,

it will not attempt to direct or control the discretion of a judge
or justice, in respect to a case as it existed when he was called
upon to act, except by the establishment of rules of practice.
If we can be called upon to inquire into the action of the jus-
tice in respect to the amount of the security required, we may
as to the pecuniary responsibility of the sureties at the time
they were accepted."

In cases like this, where the property follows the event of
the suit, "indemnity is only required in an amount sufficient
to secure the sum recovered for the use and detention of the
property, and the costs of the suit, and just damages for
delay, and costs and interest on appeal."

In this case, in ascertaining the amount of indemnity that
ought to be required, the value of the ore in the disputed
ground is not to be included, because, upon affirmance, the
property will follow the event of the suit; but, inasmuch as
under the judgment entered, the Albion company has a present
right of possession of all the ground, together with all other
rights that follow complete ownership, the value of the ores
contained therein, which, but for the supersedeas, could, and
naturally would, be worked during the pendency of the writ of
error, must be taken into consideration in providing good and
sufficient security for just damages on account of delay.

I desire to be corrected if I am wrong in concluding that
my duty requires me to fix the amount of security so as to
cover damages for delay in working all ores in the disputed
ground, including not only those which are in sight, but also
such as, in my best judgment, from the evidence before me,
although uncovered, with reasonable probability and certainty
do exist therein. And to the end that all rights may be pro-
tected, I shall separate the different items that will make up
the aggregate security required, in order that the writ may
operate as a supersedeas.

1. As to the ore in sight. Upon this point the testimony is
voluminous, and, as before stated, extremely conflicting as to
amount and value. I cannot undertake the task of giving it
in detail or even in substance. The ore exposed includes what
is represented upon "Exhibit A," as ore body "B," Albion
cave, and ore N. W. of the line A C (the dividing line between

the ground in dispute and the Richmond company's ground), between points sixty and twenty-one.

For this, estimating the amount of ore at five thousand tons, of the gross value of seventy-three dollars per ton, exclusive of lead, I shall require security in the sum of fifty-five thousand dollars.

2. For deterioration of property, necessary expenses in preserving it, etc., Mr. E. N. Robinson, the superintendent of the Albion company, testified upon this item, and his estimate was about thirty-six thousand three hundred and sixty dollars a year. He was positive that the company's loss would amount to that sum. There is no evidence against his. He gave the items that made up the aggregate sum, and I am unable to say his statement is incorrect. He estimated four years' delay. I shall adopt three years and a half, making a total, for this item, of one hundred and twenty-seven thousand two hundred and sixty dollars.

3. Security is requested on account of capital expended by the Albion company up to the present time—that is to say, interest on that sum. I do not think this should be required in addition to that stated in items 1 and 4.

4. Damages for delay in working the ground in dispute, outside of ores in sight, and realizing the probable profits therefrom.

In the court below it was found as a fact, and is the testimony before me that this mining ground is situated on Ruby Hill, in the Eureka mining district; that along and through the hill for a distance slightly exceeding a mile, and extending in a northwesterly and southeasterly direction, is a zone of limestone, in which, at different places throughout its length mineral is found; that underlying this zone, on the southerly side, is a well-defined, unbroken foot wall of quartzite, which has a general dip to the northeast; that on the northerly side of this zone of limestone is a hanging wall of shale, and that this zone of limestone is a vein or lode of rock in place, bearing gold, silver, lead and other valuable minerals.

It is shown to my satisfaction, and, in fact, it is hardly disputed, that this zone northwest of the line A C is of the same

character as on the southeast side, where the mining claims of
the Richmond and Eureka companies are situated. At the
extreme eastern point of this zone, a short distance east of the
Jackson mine, the foot and hanging walls, the quartzite and
shale come together. At the Jackson the zone is narrow. As
it extends towards the northwest it becomes wider as a rule,
until it reaches the ground in dispute, where it is as wide as
on the Richmond side, if not wider. The mines on this zone
are the Jackson at the east, then going northwesterly are the
Phenix, the K K, the Eureka Consolidated, the Richmond, and
the one in dispute. The Jackson, containing eight hundred
feet, has produced two million one hundred thousand dollars,
or a little more than two thousand six hundred dollars per
foot. The Phenix, containing six hundred feet, has produced
one million two hundred thousand dollars, or two thousand
dollars per foot. The K K, containing eight hundred feet,
has produced two million seven hundred thousand dollars, or
three thousand three hundred and seventy-five dollars per foot.
The Eureka Consolidated, containing twelve hundred feet, has
produced seventeen million five hundred thousand dollars, or a
little less than fourteen thousand six hundred dollars per foot.
The Richmond, containing eleven hundred feet, has produced
eighteen million dollars, or about sixteen thousand three hun-
dred and sixty-five dollars per foot.

The ore bodies southeast of A C are irregular in form, in
width and thickness—varying from one hundred and fifty feet
to a few inches thick. As a general rule, Mr. Wescoatt says,
they are connected by larger bodies of low-grade ore, some-
times by small seams. Immense ore bodies have been found
and worked out southeast of A C, and they were traced con-
tinuously up to and beyond that line. Ore body "B" is north-
west or on the Albion side of the line A C. The Albion cave
is on the same side, and west of "B," along the line A C,
there is ore, evidently, for a distance of one hundred or one
hundred and fifty feet. The witnesses for the Albion company
all stated that at A C the ore bodies continued, and that there
was no evidence of their giving out; that there were bowlders
and waste there, and at "B," as there had been in the Rich-
mond and Eureka. One or more witnesses testified that bowl-

ders were favorable to a continuance of ore.   Two witnesses, who put in the timbers on the Richmond side of A C and at B, stated that for some distance along A C they were obliged to put up planking to keep the ore from falling or caving down on the Albion side.   It is admitted that the timbers between A C and B are badly crushed by reason of the superincumbent weight.   They are more or less crushed further west along the A C line.   Mr. Robinson testified that the cause of the crushing was "the large amount of ore falling away from the roof on to the timbers; that it must be ore, because the limestone which encases the ore could not possibly move in the manner in which this material moves, very slowly, but constantly, thereby crushing the timbers."   "Then, again," he said, "we have the evidence of its being ore from the fact that above these crushed timbers, where we gained access, where we crawled through timbers for sixty or seventy feet, we noticed large masses of ore on the roof overhanging the timbers, from which other ore broke away."   Other witnesses corroborated these statements.   Between points twenty-four and twenty-five on the northeast side of B, a distance of forty feet, no excavations have been made, and no person can know that the ores do not extend in that direction.   The witnesses for the Richmond company all agreed that, in their opinion, the ore bodies found on the southeast of line A C did not extend to the northwest beyond that line, except at B, points twenty and twenty-one and the Albion cave.   At least, I do not remember any other point.   They gave reasons why they thought the ground in dispute contained no ore of any consequence, except at the places mentioned; while those who testified for the Albion side gave theirs for thinking absolutely opposite.   My impressions were generally favorable to the witnesses who testified, but the judgment of one side or the other must be wrong.   In my opinion the reasons for concluding that the ore bodies which have extended with occasional slight interruptions from beyond the line between the Eureka and Richmond mines, a distance of more than thirteen hundred feet, do not stop at A C or at B, or at the Albion cave, greatly preponderate over the opposite theory.   There are certain

acknowledged evidences of the presence of ores in that zone which have been followed with success in each mine.    Every witness on the Albion side stated that those evidences were visible in the disputed ground. ˙ Ores have been found far away from the line A C and the Albion cave, in small quantities, to be sure, but enough to give promise of better results upon further development.    All those witnesses testified that the Albion ground was prospectively as valuable as the Richmond.    All the evidence shows that there *may* be ore found anywhere in that zone, at least above the sixth level of the Richmond, which corresponds nearly with the first level of the Albion.    Above the sixth level of the Richmond very little prospecting has ˙been done on the Albion side, and for good reasons, only a small part of the mine has been prospected at all.    I have neither time nor space to make further mention of the testimony than to say that reports were made from the company in Eureka to the corporation in London, in relation to the ores in sight, as follows :  " In view of the delay in rendering the decision in the Albion case, which was heard in November last, and the company being meanwhile restrained by injunction from removing ore from this part of the mine, where it is abundant, it is in contemplation to shut down, temporarily, one of the large furnaces."    Mr. Rickard also testified that Mr. Harris, then foreman for the Richmond company, stated that if he could take out the ore in sight in the disputed ground, he could, with that and what he got from the men working on tribute, run the three furnaces, capable of working about sixty tons each daily, for four or five months.    I mention these two facts last stated only for the purpose of showing that, when the statements were made, it is probable, at least, that the persons making them, employes of the Richmond company, thought favorably of the prospects.

In view of all the facts, it will be strange indeed if future events shall show that, with the exception of the ore in sight, the extreme N. W. limit of these ore bodies has been reached.    It will be passing strange if that limit shall prove to be just on the line A C, with the exception of the ore bodies now exposed.

In my opinion it will be fair to the Richmond company, at least, to conclude that there is the strongest probability that the ground in dispute is, and will prove to be, as valuable, at least, as the average of the lode from the Jackson on the east; and that, during the pendency of the writ of error, the Albion company could and would work the three hundred and eighty feet extending to the northwest boundary of the Victoria claim. I shall proceed upon this theory, and estimate the period of delay to be three years and a half. The average gross product per foot of all the mines from the Jackson to the Richmond, inclusive, up to the present time, is about nine thousand two hundred and twenty dollars. Upon the same basis the gross product of the three hundred and eighty feet during the period of delay would be three million, five hundred and three thousand six hundred dollars—one-half of which, according to the evidence, would be net; that is to say, one million, seven hundred and fifty-one thousand eight hundred dollars. From this I subtract the gross value of the ore in sight, which has been fixed as five thousand tons, at seventy-three dollars per ton, three hundred and sixty-five thousand dollars, leaving one million, three hundred and eighty-six thousand eight hundred dollars as the net value of the ores not exposed in this portion of the ground in dispute, and which would be worked during the delay. The legal interest upon this sum, averaging the longest and shortest time of delay, will be seventeen and one-half per cent.—two hundred and forty-two thousand six hundred and ninety dollars—which, added to the amounts before fixed, makes a total of four hundred and twenty-four thousand nine hundred and fifty dollars. This sum, with six hundred dollars for costs, making in all four hundred and twenty-five thousand five hundred and fifty dollars, is fixed as the amount of security required in order that the writ of error herein may be a supersedeas.

In conclusion, I will say that, although the power and responsibility of passing upon the questions here presented are vested in me alone, I have counseled with my associates upon the question as to whether probable damages on account of delay in working the undeveloped ground should be included,

and I am authorized to say that they fully concur in my conclusion.